Filed 8/15/22  In re Layla C. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re LAYLA C., a Person Coming Under the Juvenile Court Law. | B316454 |
| | (Los Angeles County Super. Ct. No. 19CCJP08210B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| MARCO C., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Kristen Byrdsong, Juvenile Court Referee. Conditionally affirmed and remanded with directions.

Paul A. Swiller, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, for Plaintiff and Respondent.

_____

Marco C., the presumed father of two-year-old Layla C., appeals the November 17, 2021 order terminating his parental rights, arguing only that the Los Angeles County Department of Children and Family Services breached its affirmative and continuing duty to inquire whether Layla may have Indian ancestry as defined by the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.) and related California law. (Welf. & Inst. Code, § 224.2, subds. (a) & (b).)[1] The Department acknowledges its compliance with its duty of inquiry may have been "imperfect," but contends it made "painstaking efforts to comply," which were sufficient to satisfy that duty, and asserts, in any event, any errors were harmless.

The record belies the Department's generous characterization of its inquiry into Layla's possible Indian status. The Department failed to conduct a number of required ICWA-related interviews when it had the opportunity to do so and then, after a few unsuccessful attempts to reach several extended family members while investigating the substantive allegations of parental neglect, failed to adequately follow up with those relatives. Accordingly, although we conditionally affirm the order terminating parental rights, we remand the matter for full compliance by the Department and the juvenile court with the

_____

[1] Statutory references are to Welfare and Institutions Code unless otherwise stated.

2

inquiry and, if appropriate, notice provisions of ICWA and related California law.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Dependency Petition and Termination of Parental Rights*

On December 24, 2019 the Department filed a dependency petition on behalf of Layla (identified as Baby Girl M.) and her 15-year-old half brother, Luis T., Jr., pursuant to section 300, subdivision (b)(1), alleging the children were at substantial risk of serious physical harm because Layla had tested positive following her birth for amphetamine, methamphetamine and marijuana; Martha M., Layla and Luis's mother, had a history of substance abuse and was a current abuser of amphetamine, methamphetamine and marijuana; and Marco, Layla's father (but not Luis's),[2] had a history of substance abuse, was a current abuser of drugs and had an extensive criminal history. Martha never appeared in the dependency proceedings and had only minimal contact with the Department. Marco did not appear until the initial selection and implementation hearing (§ 366.26) on June 10, 2021.

The court detained the children following a hearing on December 26, 2019 and sustained the petition in its entirety on February 13, 2020. At the disposition hearing on July 16, 2020 the court declared Layla a dependent child of the court;[3] removed her from parental custody; placed her with her adult half sister,

---

[2]  The Department's petition and detention report indicated Luis's father, Luis T., Sr., was deceased.

[3]  The court also declared Luis a dependent child of the court. We omit further discussion of Luis, who is not a party to, or directly affected by, Marco's appeal.

3

Roxanne T., where Luis had been residing before initiation of dependency proceedings; and ordered family reunification services for both Marco and Martha, including full drug/alcohol programs and testing. The court terminated reunification services at the six-month review hearing (§ 366.21, subd. (e)) after finding the parents had failed to substantially comply with court-ordered services.

At a contested selection and implementation hearing on November 17, 2021—held after several continuances to allow the Department to complete a due diligence search for Martha's current contact information and to serve her with notice via publication—the court found Layla was adoptable, determined the permanent plan of adoption was appropriate and no exception to adoption existed, terminated Marco's and Martha's parental rights and designated Layla's current caregiver as her prospective adoptive parent. At the concurrently held permanency planning review hearing (§ 366, subd. (a)(1)), the court denied Marco's request to reinstate reunification services although Marco had begun visiting with Layla and was nearing completion of a drug program.

Marco filed a timely notice of appeal.

2. *The Department's ICWA Investigation and the Juvenile Court's ICWA Findings*

The dependency petition filed December 24, 2019 included the required Indian Child Inquiry Attachment (Judicial Council form ICWA-010(A)) for Layla, on which the Department reported the child had no known Indian ancestry. The detention report, filed the same day, stated, "The Indian Child Welfare Act does not apply" and indicated "the adult sister, Roxanne [T.] said that her family did not have any Native American Heritage."

4

Roxanne, however, was not Marco's child. Although an emergency response social worker spoke to Marco's sister Mariana G. (Layla's paternal aunt) before the petition was filed, Mariana was not asked about possible Indian ancestry in the child's paternal lineage.

Neither parent appeared at the detention hearing on December 26, 2019. Luis, Roxanne, Mariana, another paternal aunt (Lily, last name unknown) and a maternal cousin were present. The court did not ask Luis or any of the relatives about the children's possible Indian status (or anything else) and made no mention of ICWA during the hearing.

The ICWA status section of the jurisdiction/disposition report filed January 30, 2020 stated ICWA may apply, summarizing a January 13, 2020 conversation between Martha and the dependency investigator in which Martha said members of her family were "registered members of Champagne Humbles tribe in San Diego." The report noted Champagne Humbles is not a federally recognized tribe, Martha was unable to confirm the correct spelling of the tribe's name or provide any contact information, and the investigator was unable to find the tribe through an Internet search.[4] The report stated ICWA notices would be sent to the Bureau of Indian Affairs (BIA) and the Secretary of the Interior. (The record on appeal contains no copy of those notices.) According to Martha, the maternal grandmother, Aracelia M., and maternal grandfather, who lived in Whittier, were both born in Mexico, as were all four maternal

---

[4] Martha told the investigator she had just finished a program, expected to receive a copy of her enrollment card in the mail soon and would provide it to the Department when she did. No enrollment card was ever produced.

great-grandparents.  Telephone messages left by the investigator for the maternal grandmother in January 2020 were not returned.

On the same day as the interview with Martha, Roxanne reiterated her family (that is, her mother, Martha, and her father, Luis T., Sr.) had no Indian ancestry and said she had never heard of Champagne Humbles and believed Martha was lying.  The investigator also reported that on January 8, 2020 Marco had told her via telephone he did not have any Indian ancestry.

In the jurisdiction/witness statement section of the January 30, 2020 report (approximately 20 pages after the ICWA section), the investigator listed three calls made to paternal aunts Marianna and Lily on January 6, January 13, and January 22, 2020, and indicated a message had been left on each occasion (the content of those message was not disclosed).[5]  The report stated, "DI will continue to make efforts to interview paternal aunt[s] and forward the information to Court."  The calls were not returned; the record does not reflect any follow-up by the dependency investigator.

---

[5]    California Rules of Court, rule 5.481(a)(5), in effect when the Department filed its jurisdiction/disposition report, requires the petitioning child protective services agency to "include in its filings a detailed description of all inquiries, and further inquiries it has undertaken, and all information received pertaining to the child's Indian status."  That the information about the Department's several unsuccessful attempts to reach Layla's maternal grandmother and paternal aunts was not included in the ICWA status section of the report suggests whatever messages may have been left for those relatives did not include a question about Layla's possible Indian ancestry.

After sustaining the petition on February 13, 2020, the court continued the disposition hearing at the request of children's counsel because no responses had been received to the notices the Department said it had sent to the BIA and the Department of the Interior. A last minute information report for the court filed June 30, 2020 stated a stamped return receipt had been received from the BIA, but no response to the ICWA notice was received.[6] The dependency investigator left a call-back message on the voicemail listed on BIA's website. No return call was received. At the disposition hearing on July 16, 2020 (again with neither parent present), the court found ICWA did not apply to the case.

Marco appeared at the first section 366.26 hearing, held on June 10, 2021 and through appointed counsel filed the Parental Notification of Indian Status form (Judicial Council form ICWA-020) stating none of the possible bases for finding Layla was an Indian child applied. After reviewing the form, the court found there was no reason to believe ICWA applied to Layla "via Father's lineage." The court did not ask Marco any questions about Layla's possible Indian status.

During the due diligence investigation conducted concerning Martha's whereabouts prior to the final section 366.26 hearing, the Department located and spoke to a maternal uncle of Layla's (Martha's brother). Nothing in the record indicates the uncle was asked about Martha's claim the family belonged to the Champagne Humbles tribe or any other question about Layla's possible Indian status.

---

[6]     Although the last minute information report stated a copy of the return receipt was attached, no copy is in the record on appeal.

7

# DISCUSSION

1. *ICWA and the Duties of Inquiry and Notice*

ICWA and governing federal regulations (25 C.F.R. § 23.101 et seq. (2022)) set minimal procedural protections for state courts to follow before removing Indian children and placing them in foster care or adoptive homes. (*In re Y.W.* (2021) 70 Cal.App.5th 542, 551.) The statute authorizes states to provide "'a higher standard of protection'" to Indian children, their families and their tribes than the rights provided under ICWA. (*In re T.G.* (2020) 58 Cal.App.5th 275, 287-288; see 25 U.S.C. § 1921.) In addition to significantly limiting state court actions concerning out-of-family placements for Indian children (see *In re T.G.*, at pp. 287-288), ICWA permits an Indian child's tribe to intervene in or, where appropriate, exercise jurisdiction over a child custody proceeding (see 25 U.S.C. § 1911(c); *In re Isaiah W.* (2016) 1 Cal.5th 1, 8).

To ensure Indian tribes may exercise their rights in dependency proceedings as guaranteed by ICWA and related state law, investigation of a family member's belief a child may have Indian ancestry must be undertaken and notice provided to the appropriate tribes. (§ 224.2, subd. (a) [imposing on the court and child protective services agencies "an affirmative and continuing duty to inquire whether a child . . . is or may be an Indian child"]; see *In re Abbigail A.* (2016) 1 Cal.5th 83, 95; *In re Isaiah W.*, *supra*, 1 Cal.5th at p. 9.) The duty to inquire "begins with initial contact (§ 224.2, subd. (a)) and obligates the juvenile court and child protective agencies to ask all relevant involved individuals whether the child may be an Indian child." (*In re T.G.*, *supra*, 58 Cal.App.5th at p. 290; accord, *In re Antonio R.* (2022) 76 Cal.App.5th 421, 429; see § 224.2, subds. (a)-(c).)

8

In addition, section 224.2, subdivision (e), imposes a duty of further inquiry regarding the possible Indian status of the child "[i]f the court, social worker, or probation officer has reason to believe that an Indian child is involved in a proceeding, but does not have sufficient information to determine that there is reason to know that the child is an Indian child." (See also Cal. Rules of Court, rule 5.481(a)(4) [further inquiry must be conducted if the social worker "knows or has reason to know or believe that an Indian child is or may be involved"].) Further inquiry includes interviewing, as soon as practicable, extended family members, contacting the Bureau of Indian Affairs and contacting "the tribe or tribes and any other person that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility." (§ 224.2, subd. (e)(2).)

If those inquiries result in reason to know the child is an Indian child,[7] notice to the relevant tribes is required. (25 U.S.C. § 1912(a); Welf. & Inst. Code, § 224.3; see *In re J.S.* (2021) 62 Cal.App.5th 678, 686; *In re T.G., supra*, 58 Cal.App.5th at p. 290.)

"The duty to develop information concerning whether a child is an Indian child rests with the court and the Department, not the parents or members of the parents' families." (*In re Antonio R., supra*, 76 Cal.App.5th at p. 430]; accord, *In re*

---

[7] "For purposes of ICWA, an 'Indian child' is an unmarried individual under age 18 who is either a member of a federally recognized Indian tribe or is eligible for membership in a federally recognized tribe and is the biological child of a member of a federally recognized tribe." (*In re T.G., supra*, 58 Cal.App.5th at p. 287, fn. 10; see 25 U.S.C. § 1903(4) [definition of "'Indian child'"] & (8) [definition of "'Indian tribe'"]; see also Welf. & Inst. Code, § 224.1, subd. (a) [adopting federal definitions].)

*Benjamin M.* (2021) 70 Cal.App.5th 735, 742 ["the agency has a duty to gather information by conducting an initial inquiry, where the other party—here the parent . . . has no similar obligation"]; see also *In re K.R.* (2018) 20 Cal.App.5th 701, 706 ["[t]he court and the agency must act upon information received from any source, not just the parent [citations], and the parent's failure to object in the juvenile court to deficiencies in the investigation or noticing does not preclude the parent from raising the issue for the first time on appeal"].)

      2.  *Remand Is Necessary for Compliance with the Department's and the Juvenile Court's ICWA-related Inquiry Obligations*

The Department unquestionably made some effort to investigate Layla's possible status as an Indian child. But those efforts, as well as the juvenile court's oversight of them, fell well short of satisfying the affirmative and continuing duty imposed by section 224.2, subdivision (a), to inquire whether Layla may be an Indian child.

First, although section 224.2, subdivision (b), directs the child protective services agency to ask a child who has been removed from parental custody about his or her possible Indian status, nothing in the record indicates the Department spoke to Luis, who was 15 years old when dependency proceedings were initiated, about his mother's statement the family belonged to a San Diego-based Indian tribe—a claim that directly impacted Layla as well. (See also Cal. Rules of Court, rule 5.481(a)(1) [imposing on the party initiating an involuntary child-custody proceeding the duty to "ask the child, if the child is old enough" about possible Indian status].) Nor did the juvenile court, which is obligated at the first appearance of each participant in a dependency case to ask the participant about the possible Indian

10

status of the children involved, question Luis at the detention hearing about his parents' ancestry.  (See § 224.2, subd. (a)(2)(A).)  Those omissions are particularly striking given the reliance the Department and the juvenile court placed on the denials by Roxanne—Luis's sister—of any Indian ancestry on the maternal side of Layla's family.[8]

Similarly, neither the Department nor the juvenile court questioned Layla's relatives—both paternal and maternal—who were present with Luis at the detention hearing.  That hearing took place several months before the COVID-19 pandemic required the use of virtual proceedings, so that interviewing those individuals should have been a relatively simple matter.  As we have repeatedly held, the failure to interview close family members about a child's possible Indian ancestry violates the express mandate of section 224.2, subdivision (b).  (See *In re J.C.* (2022) 77 Cal.App.5th 70, 79; *In re Antonio R.*, *supra*, 76 Cal.App.5th at pp. 431-432; *In re Y.W., supra*, 70 Cal.App.5th at pp. 552-553 see also *In re S.R.* (2021) 64 Cal.App.5th 303, 314 [section 224.2 "obligates the court and child protective agencies to ask all relevant involved individuals . . .'whether the child is, or may be, an Indian child'"].)

---

[8]     The Department's speculative assertion that Roxanne, as Luis's and Layla's prospective adoptive parent, had "'a strong incentive' to disclose any Indian heritage," relying on a similar unsupported expression of opinion in *In re S.S.* (2022) 75 Cal.App.5th 575, is no more persuasive now than it was when we rejected it in *In re J.C.* (2022) 77 Cal.App.5th 70, 83-84 ["[a]s the prospective adoptive parent, the grandmother's incentive would be *not* to provide any information suggesting the child was an Indian child, so that she could adopt the child without any potential interference from the tribe"].)

The Department's reports indicate an investigator made two telephone calls to Aracelia, the maternal grandmother, in January 2020 and an unannounced visit to her home at some point before the July 2020 disposition hearing, leaving a business card. Aracelia did not respond, perhaps justifying the Department's decision not to make further attempts to contact her even though nothing in the record suggests messages left by the investigator inquired about the family's possible Indian ancestry. But the Department also spoke to a maternal uncle (Martha's brother) during its due diligence search for Martha and made no ICWA inquiry. Nor does the record indicate the Department asked this uncle (or Roxanne or Luis, for that matter) for contact information for other maternal relatives.

Finally, with respect to Layla's maternal lineage, neither the Department nor the court asked Marco when he first appeared in June 2021 whether he had any information about the Champagne Humbles tribe or had ever heard Martha talk about her family's tribal affiliation. Questioning Marco about Layla's possible status as an Indian child through Martha's family line was required not only by section 224.2, subdivisions (b) and (c), but also by federal law, which obligates state courts in an involuntary child-custody proceeding to ask each participant in the case whether the participant has reason to know the child is an Indian child (25 C.F.R. § 23.107(a) (2022)). To be sure, the juvenile court had already found ICWA did not apply to the case by the time Marco appeared at the section 366.26 hearing. But, as the Supreme Court held in *In re Isaiah W.*, *supra*, 1 Cal.5th at page 10, because the court had a continuing duty to inquire whether the child was an Indian child in all dependency proceedings, including a proceeding to terminate parental rights,

12

any order made at the section 366.26 hearing would necessarily be premised on a current finding the court had no reason to know Layla was an Indian child.

Questioning Marco and Luis and contact with additional maternal relatives would be particularly important in this case given Martha's clear statement the family had Indian ancestry and the fact the name of the tribe she provided was not traceable to any known indigenous group—whether or not federally recognized or located outside the United States. As we explained in *In re Elizabeth M.* (2018) 19 Cal.App.5th 768, 787, "Oral transmission of relevant information from generation to generation and the vagaries of translating from Indian languages to English combine to create the very real possibility that a parent's identification of the family's tribal affiliation is not accurate." Notwithstanding that Martha apparently never told Roxanne of this claimed tribal affiliation, because the Department did not speak to anyone else who might have relevant knowledge, it remains unknown whether Martha was lying, as Roxanne believed, or was conveying potentially significant, but garbled information.[9]

---

[9] That Martha had little interaction with the Department, was largely uncooperative when she did, and then disappeared certainly made more difficult the Department's ability to reach out to other maternal relatives. But it did not relieve the Department of its obligation to do so when it had the names and contact information for a number of them. (Cf. *In re Q.M.* (2022) 79 Cal.App.5th 1068, 1082 [it is not the responsibility of the child protective services agency "to intuit the names of unidentified family members or to interview individuals for whom no contact information has been provided"].)

With respect to Layla's paternal lineage, as discussed, the emergency response social worker did not ask Layla's paternal aunt Mariana whether Layla may be an Indian child when Mariana was interviewed prior to the filing of the dependency petition, and the Department and the juvenile court failed to ask the two paternal aunts about the child's potential Indian status at the detention hearing. Telephone calls made to them in January 2020 were not returned (although, as with calls to the maternal grandmother, it is unknown whether the messages left indicated the investigator was interested in the family's possible Indian ancestry). The investigator, however, represented to the court that she would continue to make efforts to interview the paternal aunts. Yet the record does not reflect any follow-up efforts during the 17-month period between those early calls and the court's finding on June 10, 2021 that it had no reason to believe ICWA applied to Layla through Marco's family; and the court failed to ask the Department whether any more recent attempts to reach those paternal relatives had been made.

The Department acknowledges this court has held, "[w]here the Department fails to discharge its initial duty of inquiry under ICWA and related California law, and the juvenile court finds ICWA does not apply notwithstanding the lack of adequate inquiry, the error is in most circumstances, as here, prejudicial and reversible. . . . [I]n determining whether the failure to make an adequate initial inquiry is prejudicial, we ask whether the information in the hands of the extended family members is likely to be meaningful in determining whether the child is an Indian child, not whether the information is likely to show the child is in fact an Indian child." (*In re Antonio R.*, *supra*, 76 Cal.App.5th at p. 435; accord, *In re Y.W.*, *supra*,

70 Cal.App.5th at p. 556; see *In re J.C.*, *supra*, 77 Cal.App.5th at p. 80 ["where, as here, the Department's failure to conduct an adequate inquiry makes it impossible for the parent to show prejudice, we must remand for a proper inquiry"].) Nonetheless, asserting it is not clear what more it could have done and emphasizing that Layla's maternal grandparents and great-grandparents were born in Mexico, the Department argues any errors it may have made were harmless.

There is far more that the Department could—and should—have done, beginning with asking Luis and Marco about Martha's understanding that the maternal family belonged to an Indian tribe based in San Diego. In addition, on Martha's side of the family, her brother (Layla's maternal uncle), interviewed during the due diligence search for Martha's contact information, should have been asked whether he knew anything about a Champagne Humbles tribe or the family's connection to any Indian tribe.

The Department's additional emphasis on Martha's Mexican lineage, which it couples with an unnecessary reminder that ICWA applies only to federally recognized tribes, is misplaced. The traditional homelands of dozens of federally recognized tribes straddle the United States-Mexico border, and it has been estimated that "tens of thousands of people belonging to U.S. Native tribes live in the Mexican states of Baja California, Sonora, Coahuila and Chihuahua." (*For Native Americans, US-Mexico Border Is an "Imaginary Line"* (March 19, 2019) The Conversation <https://theconversation.com/for-native-americans-us-mexico-border-is-an-imaginary-line-111043> [as of Aug. 15, 2022l, archived at <https://perma.cc/AZ8Z-XBYV>; see, e.g., Office Web Site of the Tohono O'odham Nation, *Community*

15

<http://www.tonation-nsn.gov/community/> [as of Aug. 15, 2022], archived at <https://perma.cc/5MXN-2W86> [some members of the Tohono O'odham Nation—a federally recognized tribe whose origin was in the Sonora Desert—live in Mexico].) The Department's reports do not indicate where in Mexico Layla's maternal grandparents and great-grandparents were born. That lack of information, together with the likelihood that Martha's recollection of the name of her family's tribe was inaccurate, makes it impossible to conclude, as the Department suggests, the family's Mexican ancestry necessarily precludes a finding that Layla may be an Indian child.

As for Marco's side of the family, the Department had contact information for two paternal aunts. Although for whatever reason they did not return the Department's telephone calls in January 2020, that they cared enough about Layla to come to the detention hearing indicated a concern for her welfare and a willingness to be involved in the proceedings. The Department should have made additional efforts to contact them, as its investigator assured the court would be done—particularly once Marco appeared in the dependency proceedings, began visiting with Layla and expressed his own interest in reunifying with his child.

## DISPOSITION

The November 17, 2021 order terminating Marco's parental rights is conditionally affirmed. The matter is remanded to the juvenile court for full compliance with the inquiry and notice provisions of ICWA and related California law and for further proceedings not inconsistent with this opinion.


PERLUSS, P. J.

We concur:


SEGAL, J.


FEUER, J.